In re Anthony PIMPINELLA, Debtor.

AID AUTO STORES, INC., Plaintiff,

v.

Anthony PIMPINELLA, Defendant.

Bankruptcy No. 190–11454–353.
Adv. No. 190–1264–353.

United States Bankruptcy Court,
E.D. New York.

Nov. 27, 1991.

Cowan, Liebowitz & Latman, P.C. by Michael F. Maschio, New York City, for Aid Auto Stores, Inc.

Horowitz & Associates by Richard Osserman, New York City, for debtor.

## DECISION ON COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE

JEROME FELLER, Bankruptcy Judge.

Aid Auto Stores, Inc. ("Plaintiff" or "Aid") commenced this adversary proceeding on July 18, 1990, against Anthony Pimpinella ("Debtor") in an effort to bar his discharge pursuant to 11 U.S.C. § 727(a)(2) and (3). Subsequently, on December 10, 1990, an amended complaint was filed, and the Debtor interposed a second amended answer containing a counterclaim and four affirmative defenses. By Order dated February 11, 1991, this Court struck the counterclaim, as well as the third and fourth affirmative defenses. Following an initial hearing, the parties, at the Court's direction, filed a joint memorandum reflecting, among other things, both the contested and uncontested facts. Thereafter, on May 2, 1991, a trial was held, and in June and July of 1991 post-trial submissions were filed by the Debtor and Plaintiff.

Based upon the facts, and for reasons hereinafter set forth, we can only conclude that the discharge of the Debtor should be denied, pursuant to 11 U.S.C. § 727(a)(3), for failure to keep and preserve financial records and papers from which his financial condition or business transactions might be ascertained.[1]

## I. *Facts*

In March of 1987, Debtor, a Brooklyn resident, entered into a franchise agreement with Aid, a Delaware corporation qualified to do business in New York. Aid is in the business of franchising auto parts stores throughout the New York metropolitan area. Pursuant to this agreement, Debtor paid Aid a one-time fee of $15,000 and agreed to tender monthly franchise payments of $400. Debtor also elected to participate in advertising campaigns run by Aid, for which service Debtor would be charged an additional fee to be shared on a *pro rata* basis with other franchise participants.

In July of 1988, Debtor purchased an Aid auto supply franchise store in Bayonne, New Jersey, from PJI, Inc. ("PJI") for a total sum of $90,000; this purchase price included approximately $60,000 of existing inventory. The Debtor tendered a $45,000 cash payment and executed a promissory note to PJI for the balance, secured by the assets of the business and personally guaranteed by the Debtor. Thereafter, Debtor commenced his franchise operations as Staten Auto Parts, Inc. and began to order goods from several suppliers, including Aid.

Between December 5, 1988, and November 25, 1989, the Debtor, by failing to pay for goods received, as well as the required monthly franchise and advertising fees, incurred debts to Aid totalling $63,103.85. During that time the Debtor made only one payment of $418.46 to Aid, reducing the balance due and owing to $62,685.39. In addition to defaulting on its debts to Aid, Debtor also failed to make payments with respect to PJI's note, and as a result, in October of 1989 PJI foreclosed on the Debtor's assets. A foreclosure sale was held on October 30, 1989, at which time virtually all of the store's assets were sold. Certain assets were purchased by Ms. Antoinette Pollina, the Debtor's sister, either individually or through her business, Luney Tune Concepts, Inc.

Shortly after the foreclosure sale, Aid commenced a state court action on December 18, 1989, in the Supreme Court of the State of New York, County of Nassau, seeking to recover the monies due and owing. By virtue of 11 U.S.C. § 362, the state court action was automatically stayed by the Debtor's Chapter 7 filing on April

---

**1.** Plaintiff's failure to pursue its claim under 11 U.S.C. § 727(a)(2) at trial, as well as its failure to address such claim in its post-trial submissions, allows this Court to deem such claim as abandoned.

17, 1990. The Debtor's petition lists assets of $1,110 and liabilities totalling $132,685.39, of which Aid represents by far the largest single claim. In response to this filing, Aid brought this adversary proceeding alleging, *inter alia*, an inability to ascertain the Debtor's financial affairs due to its failure to keep and preserve financial papers or business records.

The records produced by the Debtor consist exclusively of a red binder (the "Red Book") which, as the Debtor's testimony revealed, only reflects a portion of the Debtor's business affairs. Contained within this Red Book are bank statements, deposit slips, utility bills, untotalled cash register receipts, cancelled checks and assorted handwritten notations. Although the business did not close until the end of October 1989, no cash register receipts were maintained for the months of September or October. The collection of cancelled checks is incomplete in that it does not continue past August of 1989 and no checks exist for March of 1989. (Transcript of 5/2/91 at 45 & 60).[2] Further, although the Debtor attests to borrowing approximately $80,000 from his father, no notations were made in the Red Book to reflect this loan or to record what portion of this money was subsequently deposited into the business' bank account. (Tr. 87–88).

The Red Book also contains a handwritten reference to daily purchases made by check, as well as stock "purchases" from Aid. The "purchases" notations reflect only the receipt of inventory from Aid, and not actual payments made. (Tr. at 39). Such record keeping is incomplete in that no entries were made to reflect cash payments tendered to the other suppliers used by Debtor, such as Golden Apple, Millman and American Specialty. (Tr. at 16). The Debtor claims to have at some point possessed invoices that would have documented his cash expenditures; however, he maintains that these were thrown out at the close of the business. (Tr. at 18). In

the absence of records, the Debtor surmises that he made cash payments of $200–$400 a month to Golden Apple, approximately $100–$200 a month to American Specialty, and between $200–$400 a year to Millman. (Tr. at 48–49).

Debtor states that at some point he also maintained a short form ledger, which summarized all of the transactions recorded in the Red Book. However, according to the Debtor, this too was lost. (Tr. at 32 & 34). The Debtor has also failed to produce copies of the business' tax returns. Further, the Debtor has either been unable or unwilling to produce any records from the foreclosure sale.[3]

In the absence of documentation relating to the foreclosure sale, Debtor surmises that somewhere between $40,000 and $60,000 in merchandise was sold. (Tr. at 47). In so far as the store's fixtures are concerned, the Debtor affixes no value. Due to Debtor's failure to maintain a current listing of inventory on hand, he is unable to be specific as to what exactly was sold at the foreclosure sale. Further, Debtor's failure to keep records of the sale prevents his accounting for the amount of money obtained by PJI as a result of the sale.

In an effort to ascertain what happened to their assets Aid had Mr. Vincent Anthony Cuzzo, their Controller and a certified public accountant, review the Red Book. At the trial, Mr. Cuzzo testified that he had carefully examined the contents of the Red Book, although he did not tally all the daily cash register receipts. (Tr. at 58). Based upon his review of the Red Book, Mr. Cuzzo stated that he was unable to determine what had happened to the assets of the Debtor and was unable to trace a significant portion of the monies estimated to have been received by the Debtor during the business' operations.

In an effort to estimate the receipts of the Debtor over the period of his business operations, Mr. Cuzzo offered the following

---

**2.** Hereafter, "Tr" will be used to refer to the trial transcript of 5/2/91.

**3.** The Debtor attempts to justify the absence of these documents in its post-trial submissions.

However, Debtor's failure to adduce any evidence at trial to support such arguments precludes this Court from considering them.

calculations. Mr. Cuzzo estimated that $185,000 worth of inventory, wholesale price, had been purchased by the Debtor. This figure was based upon the store's opening inventory of $60,000, the approximate $63,000 owed to Aid for inventory purchases and an additional $62,000 in check payments made for inventory, which were reflected in the Red Book; the value of any inventory purchased with cash was obviously omitted from these calculations since no records of such purchases exists. (Tr. at 59–65) From this total, Mr. Cuzzo then deducted, $30,000, in order to reflect the store's closing inventory.[4] (Tr. at 65). After factoring in an additional amount to represent a forty-five percent markup, which according to Mr. Cuzzo was the amount usually recommended by Aid to its franchises, and by then adding 5% to allow for sales tax, Mr. Cuzzo estimated that the total amount generated by the Debtor's sales should have been in the neighborhood of $250,000. (Tr. at 62 & 65). Mr. Cuzzo then pointed out that the Debtor's business bank statements only reflected total deposits of $142,000, leaving $100,000 unaccounted. (Tr. at 66). Alternatively, utilizing the Debtor's claimed markup percentage of 25% (Tr. at 77) these calculations would produce an estimated total in excess of $200,000, thereby leaving the approximated sum of $60,000 unaccounted. The matter is further complicated by the absence of documentation regarding the $80,000 loan from the Debtor's father (Tr. at 87), which makes it impossible to identify what portion of the $142,000 in deposits reflects the actual business receipts as opposed to money obtained from Debtor's father.

## II. *Discussion*

 "The relief of discharge is a cornerstone of the debtor's 'fresh start' in bankruptcy. It enables the debtor to begin his post-bankruptcy life with a clean slate vis-a-vis his creditors." *Schultz v. Shapiro (In re Shapiro)*, 59 B.R. 844, 847 (Bankr.

E.D.N.Y.1986). Such relief, however is a privilege not a right and should inure only to the benefit of the honest Debtor. *See Scarsdale Nat'l Bank and Trust Co. v. Switzer (In re Switzer)*, 55 B.R. 991, 997 (Bankr.S.D.N.Y.1986). Thus, the Code provides in 11 U.S.C. § 727(a) various grounds for denying the discharge of an abusive or unworthy debtor. In keeping with the "fresh start" policy, any objections are to be strictly construed against the objector and in favor of the Debtor. *In re Shapiro*, 59 B.R. at 847 (citing caselaw).

 Section 727(a)(3) bars discharge for failure "to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such … failure … was justified under all of the circumstances of the case." The purpose behind this provision is to insure that trustees and creditors will have enough information on hand to effectively evaluate the financial status of a debtor's estate. *In re Shapiro*, 59 B.R. at 848. Intent to conceal information is not necessary to support a denial of discharge under § 727(a)(3). *Id.* The standard by which the sufficiency of such records are to be measured was set forth by this Circuit in the seminal case of *In re Underhill:*

> The law … does not require that [the debtor's books and records] … be kept in any special form of accounts. It is a question in each instance of reasonableness in the particular circumstances. *Complete disclosure is in every case a condition precedent to the granting of a discharge,* and if such a disclosure is not possible, without the keeping of books or records, then the absence of such amounts to that failure to which the act applies.

82 F.2d 258, 259–60 (2d Cir.), *cert. denied,* 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936) (emphasis added).[5] Thus, a bankruptcy

---

**4.** The Debtor approximated such value to be somewhere between $40,000 to $60,000. (Tr. at 25–27).

**5.** The *Underhill* case was, of course, decided under a predecessor provision of § 727(a)(3)

contained in the former Bankruptcy Act. § 727(a)(3) is virtually identical in wording to its earlier formulations under the former Bank-

court must view the adequacy of the debtor's books and records on a case-by-case basis.

■ Whether or not the records produced by a debtor are sufficient to afford adequate disclosure is a determination vested within the sound discretion of the court. The burden of proving the inadequacy of the debtor's records rests with the objectant. *In re Martin,* 554 F.2d 55, 58 (2d Cir.1977); *In re Shapiro,* 59 B.R. at 848. A court should not be required to speculate as to the loss of the debtor's assets, nor should trustees or creditors be forced to reconstruct the debtor's affairs. *See In re Shapiro,* 59 B.R. at 848; *In re Switzer,* 55 B.R. at 997; *see also American Motors Leasing Corp. v. Morando (In re Morando),* 116 B.R. 14, 15 (Bankr.D.Mass.1990). Similarly, the debtor may not, by oral testimony, supplement that information which is absent from the actual records. *See In re Underhill,* 82 F.2d at 260; *see also Groetzinger v. Rusnak (In re Rusnak),* 110 B.R. 771, 776 (Bankr.W.D.Pa.1990) (citing *International Shoe Co. v. Lewine,* 68 F.2d 517, 518 (5th Cir.1934)); *In re Shapiro,* 59 B.R. at 848.

■ Once a determination has been made that the records fail to provide interested parties with a means to ascertain the debtor's financial affairs, the debtor is to be afforded an opportunity to justify the deficiencies. *In re Morando,* 116 B.R. at 15 (citing *Manhattan Leasing Sys., Inc. v. Goblick (In re Goblick),* 93 B.R. 771, 775 (Bankr.M.D.Fla.1988)). The debtor must do more than profess a belief that his records were sufficient or that it was not his practice to keep additional records. *See United States Fidelity & Guaranty v. Delancey (In re Delancey),* 58 B.R. 762, 768 (Bankr.S.D.N.Y.1986) (quoting *In re Sandow,* 151 F.2d 807, 809 (2d Cir.1945)). "Any attempt to justify the failure to keep records must show that the circumstances were in fact so unusual that ordinary

record keeping was not required." *In re Morando,* 116 B.R. at 16 (citing *In re Delancey,* 58 B.R. at 768).

■ The Red Book produced by the Debtor contains fragmentary, incomplete and often ambiguous documentation. A true picture of the Debtor's financial condition or business transactions is thus rendered impossible. For a business which, according to the Debtor's testimony, purchased a considerable amount of inventory with cash, the failure to preserve any records to document a large portion of its transactions necessarily stymies any attempt to accurately and completely assess the Debtor's business condition. "Implicit in the duty to produce records reflecting [the debtor's] financial condition is the obligation to take reasonable precautions for the preservation of these records." *In re Switzer,* 55 B.R. at 997–98 (citing *Federal Deposit Ins. Corp. v. Kottwitz (In re Kottwitz),* 42 B.R. 566, 569 (Bankr.W.D.Mo. 1984)). Thus, the fact that Debtor threw out whatever invoices he had documenting cash purchases is a mistake from which the Debtor must suffer the consequences. Debtor's oral estimates regarding the amount of cash expended surely cannot fill the void. Apart from being conjectural, such testimony is at best conclusory and at worst self-serving. Minimally, creditors and this Court are entitled to have some concrete basis against which to assess such statements. *See In re Rusnak,* 110 B.R. at 776.

The Debtor's faulty and flimsy record keeping reached a new crescendo in the last few months prior to closure of his Aid auto franchise business, when he failed to retain or preserve even cancelled checks and cash register receipts. The scant information available for the last few months of business operations is further exacerbated by the Debtor's failure to maintain a closing inventory and his failure to retain any records whatsoever from the foreclosure sale of the business assets.

---

ruptcy Act. Accordingly, decisions under the former Bankruptcy Act dealing with the failure to keep or preserve financial records are authority for interpretations of § 727(a)(3) of the

Bankruptcy Code. *See Dominick & Dominick, Inc. v. Baxter (In re Baxter),* 96 B.R. 58, 60 (Bankr.E.D.Va.1989).

Having found that the Debtor failed to keep and preserve records and papers from which his financial condition and business transactions can be ascertained, the Court must determine whether such failure was justified under all the circumstances of the case. We have searched diligently the entire record of this litigation, and can state, without hesitation, that the Debtor has utterly failed to present any cogent justification or explanation for his failure to keep and preserve sufficient records and papers. Instead, Debtor seems to advance, as best as this Court can divine, three contentions, none of which have any merit. Debtor first maintains that the trial testimony of Mr. Cuzzo is inherently flawed in that the figures used in his calculations were inaccurate. However, notwithstanding any alleged flaws, such testimony is still useful in supporting Plaintiff's case. On the contrary, the fact that Mr. Cuzzo, a duly qualified and experienced accountant, was forced to surmise in effort to assess the Debtor's financial affairs illustrates graphically the inadequacy of Debtor's records and highlights Plaintiff's inability to obtain relevant and important information. *See First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 888 (7th Cir. 1983), *cited in In re Switzer*, 55 B.R. at 997 ("creditors and the court need not be required to guess what actually occurred").

Next, the Debtor attempts to shift the burden of disclosure to the Plaintiff, claiming that the lack of information is due to Plaintiff's failure to tally the cash register receipts. However, the Debtor's contention that had Plaintiff undertaken such calculations the discrepancies in bank deposits would have been resolved, is disingenuous at best. First, the Debtor fails to explain how such receipts, even if tallied, would fill the void created by the absence of other documentation. Secondly, the burden of keeping comprehensible records is upon the Debtor. Plaintiff is not required to sift through voluminous receipts and scraps of paper in order to trace assets.

> [H]owever informal the record keeping, the financial history of a debtor must be preserved in enough of a paper trail so that those concerned ... need not be experienced explorers of a rat's nest of scraps of uncoordinated bits and pieces like parts of some impressionistic puzzle that needs to be solved in order to decipher the financial machinations of the debtor.

*In re Morando*, 116 B.R. at 16.

Finally, the Debtor asserts that his failure to maintain adequate books and records is excusable because Plaintiff has independent knowledge of the Debtor's business and thus should not need such records. For this silly argument the Debtor cites the case of *Chaudhry v. Usoskin (In re Usoskin)*, 56 B.R. 805, 816 (Bankr. E.D.N.Y.1985). In *Usoskin*, Judge Goetz dismissed a § 727(a)(3) adversary proceeding after finding, *inter alia*, that not only were the records produced sufficient to afford complete disclosure of all business affairs, but given plaintiffs' intimate knowledge of debtor's business such records were more than ample to allow an evaluation of the financial condition of the business. Unlike *Usoskin*, the records produced here are insufficient to provide complete disclosure to anyone and the Debtor has produced no evidence relating to Plaintiff's knowledge of his business operations. Moreover, whatever knowledge Plaintiff might possess in respect of automobile supply franchise stores generally, and Debtor's store in particular, cannot supplement or fill the gaps created by the absence of cancelled checks, cash register receipts, invoices and other documentation.

## III. *Conclusions*

1. This court has jurisdiction over the instant adversary proceeding pursuant to 28 U.S.C. § 1334, as well as the United States District Court for the Eastern District of New York standing order of reference.

2. This adversary proceeding is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(J).

3. Debtor has failed to keep and preserve adequate records and papers from which his financial condition or business

transactions might be ascertained as required by 11 U.S.C. § 727(a)(3).

4. Debtor has failed to justify his failure to keep such records.

5. Debtor's discharge must be denied for failure to comply with 11 U.S.C. § 727(a)(3).

6. The parties shall bear their respective costs in litigating this adversary proceeding.

SETTLE ORDER.